SECO CHEMICALS, INC., DIVISION OF STAN SAX CORPORATION
*v.* ROBERT A. STEWART.

[No. 2-375A67. Filed July 6, 1976. Rehearing denied August 12, 1976.]

*Wayne C. Ponader, Theodore J. Nowacki, Bose, McKinney & Evans,* of Indianapolis, for appellant.

*Thomas J. Young, Young & Young,* of Indianapolis, for appellee.

## CASE SUMMARY

LOWDERMILK, J.—The instant case was transferred from the Second District to this office on June 14, 1976, in order to lessen the disparity in caseloads between the Districts.

Defendant-appellant Seco Chemicals, Inc., Division of Stan Sax Corporation (Seco) appeals from a judgment of $9,297.03 and costs entered against it and in favor of plaintiff-appellee Robert A. Stewart (Stewart), who had complained of a breach by Seco of an employment contract between the parties.

Stewart cross-appeals.

We affirm in part and reverse in part.

## FACTS

For 12 years Stewart was engaged in selling items to manufacturers for use in their metal plating operations. These items fell into three categories: buffers, cleaners, and electroplating processes. Stewart sold the latter almost exclusively.

In 1968 he left this employment and then worked for a firm of stock brokers until mid-1971.

He was approached in early 1971 by Vince Kelly (Kelly), president of Seco, who told Stewart that Seco would like him to re-enter the electroplating sales field as a salesman of Seco's lines of electroplating processes, cleaners, and buffers.

Stewart and Kelly understood that Stewart would not leave the brokerage to enter Seco's employ without a contract.

On June 15, 1971, Stewart and Kelly executed an "Employment Agreement" which provided:

"WHEREAS, employers are engaged in the business of furnishing supplies to the electro-plating industry, and,

WHEREAS, employee has experience in this field of business, and,

WHEREAS, the parties hereto desire to enter into an employment agreement whereby employer will employ employee in the position of engineering sales, and,

WHEREAS, the parties hereto desire to set forth the terms and conditions of their employment relationship.

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, the parties agree as follows:

1. *Territory.* The employee shall be responsible for and shall have the exclusive territory of the states of Indiana [and] Kentucky, . . .

\* \* \*

3. *Compensation.*

(a) Salary. Employer shall pay employee for services rendered the sum of $1,600.00 per month, payable at $800 on the fifteenth (15) and last day of each month during the contract period. Employer will withhold taxes according to the Internal Revenue laws and will also pay Social Security in accordance with said laws.

(b) *Commission.* In addition to the aforesaid salary, employee will receive seven (7) per cent commission on all sales over and above $50,000.00 per quarter. Buffing and polishing compounds shall be the only products excluded for the present. . . .

*4. Position and Title.* Employee's position is Engineering Sales and his title will be Vice President and Regional Sales Manager.

\* \* \*

*6. Term of Employment.* As an inducement by employer to employee to enter into this contract, and in considering that employee will be leaving a line of business which he has been developing for several years, it is expressly agreed and understood that the term of this contract is for a minimum of two (2) years and one (1) month beginning 15 June, 1971 through 16 July, 1973. . . .

\* \* \*

*8. Binding Effect.* . . . Any violation of the terms of this contract by employer shall render the contract voidable by employee, in which event employee shall have the option to continue working under the terms of the contract or terminate said working relationship and receive as liquidated damages the balance due under the remainder of the term of the contract as set out in Section 3 (a) of this contract."

This agreement bore three signature lines. The first—for Seco—was labeled "Employer". Kelly signed thereon on behalf of Seco. The next line—for Stewart, the "Employee"—was signed by him. The last one—for Stan Sax Corporation, an "Employer"—was blank.

On June 15, 1971, Seco was a separate corporation, although a wholly owned subsidiary of Stan Sax Corporation. All the shares in Stan Sax Corporation were in turn owned by Stanley P. Sax (Sax), who was its president and sole possessor of the authority to contract on its behalf.

After Stewart commenced his employment with Seco he learned that it did not have a line of electroplating processes; he could therefore only sell cleaners and buffers.

His sales failed to reach the level at which he was to earn a commission. In fact, his sales did not cover his salary and expenses.

Sax, having replaced Kelly as president of Seco, discharged Stewart on September 15, 1972.

Stewart's next employment was for the last two weeks of 1972 at an environmental engineering firm in Anderson, Indiana. His salary was $1,000 per month. He voluntarily left this job.

Thereafter he was unemployed until securing a position in early February, 1973, as a program analyst with the Community Services Program. His salary was the same.

In May, 1973, he began working as a chemical engineer with the Environmental Protection Agency in Chicago, Illinois, at a salary of $17,000 per year. He remained in that position until after July 16, 1973.

## ISSUES

1. Whether the trial court erred in finding that the signature of Sax, on behalf of Stan Sax Corporation, was not necessary for the agreement to be enforceable.

2. Whether the agreement was unenforceable for lack of mutuality.

3. Whether the trial court erred in finding that Seco breached the contract by discharging Stewart.

4. Whether Stewart's cross-appeal is properly before this court.

5. Whether the trial court erred in finding that Stewart had a duty to mitigate damages, and in entering its judgment accordingly.

## DECISION

ISSUE ONE:

Seco's first attack on the enforceability of the agreement focuses on the lack of a signature by Sax as agent for Stan Sax Corporation.

Seco espouses a "general rule that where a contract in writing is obviously drawn as a mutual agreement between

several parties, to be signed by all of them, it must be so executed by all of such parties, by signing it or otherwise acceding to its terms, so that it binds them all or it will not bind any of them." *Hess* v. *Lackey* (1921), 191 Ind. 107, 112-113, 132 N.E. 257.

However, *Hess* also exposes the fallacy in Seco's position. Our Supreme Court found its holding in *Hess* upon the bedrock of the intent of the parties stating at 191 Ind. 113:

"The language used imports throughout an intention that all of the eight surviving children of Rachael A. Lackey, named in her will as the only beneficiaries thereunder, should sign the contract. The declared purpose of the agreement was to give to the children of the deceased son a child's portion, which could not be accomplished unless all of the eight legatees signed it. And there is nothing in the instrument to evidence an intention that the contract should bind those signing it until and unless it was signed by all of the eight legatees."

It is therefore apparent that Sax's signature was necessary to make the agreement enforceable against all parties only if Stewart and Kelly so intended; in fact, it could have been valid without any signatures—if that had been the intent of the parties. 1 Corbin, *Contracts* § 31 (1963).

The parties presented the trial court with conflicting evidence as to whether Stewart and Kelly intended Sax's signature to be a prerequisite to the enforceability of their agreement. On an appeal from a trial to the court, we may not reverse the trial court's findings or judgment unless they are clearly erroneous. Ind. Rules of Procedure, Trial Rule 52 (A). Therefore we can set aside such a finding only where—although there is evidence to support it—a review of the entire record leaves us with a definite and firm conviction that a mistake has been made. *Citizens Gas and Coke Utility* v. *Wells* (1971), 150 Ind. App. 78, 275 N.E.2d 323. In our review we must give "due regard" to the trial court's assessment of the credibility of the witnesses. TR. 52 (A).

The conflicting evidence here leaves us with no such conviction.

ISSUE TWO:

Seco next disputes the enforceability of the agreement on the ground that it lacked mutuality of obligation. We therefore must traverse an area of the law that is unsettled.

Seco relies on *Zeyher* v. *S.S.&S. Manufacturing Co.* (7th Cir. 1963), 319 F.2d 606, an appeal of an action for commissions that might have been earned had the Indiana employer not terminated its relationship with the plaintiff employee. The opinion affirmed the trial court's decision that the "contract" was unenforceable for want of certainty and mutuality in that it created "no obligation which either party can legally enforce against the other." 319 F.2d 607. The employee did not promise to secure any orders for the employer or to sell a minimum or maximum of its products; the employer did not specify when—if ever—it would be bound to accept orders obtained by the employee.

The agreement in the case at bar differs from the writing in *Zeyher* in that Stewart agreed to "be responsible for" an "exclusive territory" (clause No. 1). This provision removes the instant case from the rationale of the *Zeyher* decision, which noted at 319 F.2d 608:

> "In *Wood* v. *Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 118 N.E. 214 (1917), the court implied consideration where defendant gave an exclusive agency, and unless the agent 'gave his efforts, she could never get anything.' That is not true of S.S.&S. because plaintiff did not have an exclusive agency. We do not find in the case at bar the facts which in *Lady Duff-Gordon* impelled the court to conclude that the transaction there 'was instinct with obligation.'"

Professor Corbin cuts through the smokescreen created by cases like *Zeyher*:

> "There are many employment contracts, more or less indefinite in some respects, in which the 'mutuality' concept has been involved. General statements that are not easily

reconcilable are made in the opinions; and a careful analysis of the facts as reported shows that the decisions themselves are not reconcilable. . . . It is . . . clear that a denial of enforcement cannot be justified by a mere statement that the contract is 'lacking in mutuality.' Such agreements, like all others, may be void of obligation, while wholly executory, for the reason that neither party has made a promise of any kind. The same is true if one of the parties has made a promise and the other party has made no return promise and has given no executed consideration of act or forbearance. In these cases 'mutuality of obligation' is lacking; but 'individual obligation' is likewise lacking.

"The case is quite different, however, when an employer has made a promise of compensation for service and the employee has begun or has rendered such service without having made any promise, express or implied, to begin or to continue it. In these cases, the employer is under an obligation (a legal duty), although the extent and character of that obligation are dependent on the terms of the promise that induced the service. Here there is 'obligation,' without 'mutuality of obligation.' The service is terminable 'at will' by the employee; he was under no obligation to serve, and after his termination he is under no obligation either to serve or to do anything else. The employer's situation requires further analysis.

"[I]f the employer made a promise, either express or implied, not only to pay for the service but also that the employment should continue for a period of time that is either definite or capable of being determined, the employment is not terminable by him 'at will' after the employee has begun or rendered some of the requested service or has given any other consideration (or has acted in reliance on the promise in such manner as to make applicable the rule in Restatement, Contracts, § 90). This is true even though the employee has made no return promise and has retained the power and legal privilege of terminating the employment 'at will'. The employer's promise is supported by the service that has been begun or rendered or by the other executed consideration or action in reliance. There is a valid unilateral contract; there is an obligation although there is no 'mutuality of obligation.' There are, indeed, cases holding otherwise, in the belief that 'both parties must be bound or neither one is bound,' that for a valid contract there must be 'mutuality of obligation' (or something called 'mutuality'), and that if a contract is terminable 'at will' by one party it is necessarily terminable

'at will' by the other party also. These decisions can be found in considerable number; but the decisions to the contrary are far better considered, both in justice and in theory." 1A Corbin, *supra*, § 152, at 13-17.

The trial court's decision—i.e., the agreement between Seco and Stewart was a binding contract—squares with Indiana law. Our Supreme Court stated in *Davis* v. *Davis* (1926), 197 Ind. 386, 391, 151 N.E. 134, that an employee could assert a claim for breach of contract based on "the refusal of his employer to furnish him employment . . . or to pay him wages for days when he is not permitted to work" where he "has *bound himself by a reciprocal undertaking, such as a contract to continue in the service of his employer for some fixed period of time and to work during that period for a stipulated rate of compensation.* (Our emphasis)."

The trial court's holding is also consistent with the Indiana rule that there is no mutuality deficiency where one party to an agreement acts upon the promises of the other party and performs his part of the agreement—because the other party becomes bound by that performance. *Wallace* v. *Mertz* (1927), 86 Ind. App. 185, 156 N.E. 562; *Eichholtz* v. *Taylor* (1882), 88 Ind. 38. See also *Restatement, Contracts* § 90.

The evidence was uncontroverted that Stewart agreed to work for Seco for a fixed period of time at a stipulated rate of compensation, performed his part of the agreement by rendering services to Seco, and gave what the parties expressly recognized as "consideration" by abandoning his position with the brokerage firm. (Clause No. 6).

We conclude that the trial court's findings were not erroneous as to this issue. *Citizens Gas and Coke Utility* v. *Wells, supra*. Therefore those findings must not be disturbed. TR. 52(A).

ISSUE THREE:

Seco argues that even if there was a valid employment agreement, it was not breached by Seco's discharge of Stewart.

Where, as here, there is an employment contract for a definite term in which the employer has not reserved the right to terminate the employment before the conclusion of the contract, the employment "may not be terminated before the expiration of such term except for cause or by mutual agreement." *Rochester Capital Leasing Corp.* v. *McCracken* (1973), 156 Ind. App. 128, 295 N.E.2d 375, 378.

Inasmuch as Stewart did not agree to his discharge, we must inquire whether Seco's action was justified by a cause for discharge, as set forth in 53 Am.Jur. 2d, *Master and Servant* § 51, at 126-127:

"Without doubt an employee, although engaged for a definite term of service, may be dismissed because of inefficiency, unskilfulness, neglect, or carelessness. The law implies a stipulation or undertaking by an employee in entering into a contract of employment that he is competent to perform the work undertaken and is possessed of the requisite skill and knowledge to enable him to do so, and that he will do the work of the employer in a careful manner. If he is not qualified to do the work which he undertakes, if he is incompetent, unskilful, or inefficient, or if he executes his work in a negligent manner or is otherwise guilty of neglect of duty, he may lawfully be discharged before the expiration of his term of employment. These principles apply with equal force to employees who have been engaged permanently or for their lifetimes, and to all classes of employees, including . . . salesmen. . . .

"The degree of skill, care, diligence, and attention imposed by the implied possession of competency, knowledge, skilfulness, etc., on the part of one entering into a contract of employment is that of ordinary and reasonable skill, care, and diligence; he cannot be discharged on the ground of incompetency, negligence, etc., merely because he fails to employ the highest degree of skilfulness and care known in the trade, unless the contract of employment expressly stipulates for such degree of skill and care, or unless the employee represents that he possesses such."

See *City of Crawfordsville* v. *Hays* (1873), 42 Ind. 200. An employer's right to discharge can be based on material matters but not on trivialities. *Hamilton* v. *Love* (1899), 152 Ind. 641, 53 N.E. 181.

The parties at trial produced conflicting evidence as to whether Stewart's scarcity of sales was due to his incompetency or lack of effort or was due to circumstances beyond his control.

Faced with such conflicting evidence, we now uphold the trial court's finding on this issue inasmuch as it is not erroneous, TR. 52(A).

ISSUE FOUR:

We now turn to Stewart's cross-appeal, which Seco urges us to ignore because Stewart did not file a praecipe.

Filing a praecipe is required to initiate an appeal. Ind. Rules of Procedure, Appellate Rule 2(A). Once Seco set the appellate machinery in motion by filing its praecipe, the purpose of AP. 2(A) was fulfilled so that Stewart was not obligated to comply with the rule.[1] The law does not require the doing of a useless thing.

The only mention of a cross-appeal in our rules is in Ind. Rules of Procedure, Trial Rule 59(D), Appellate Rule 8.1(A) and Appellate Rule 8.3(D). A party must assign and preserve a cross-error by raising it in a motion to correct errors filed in the trial court within 15 days after the "service" of the opposing party's motion to correct errors. TR. 59(D). But the cross-error will be "stricken out" on appeal unless the party asserting it files, within 30 days after the filing of the appellant's brief, a brief containing the issues and argument involved in the cross-appeal as well as the answer to the appellant's brief. AP. 8.1(A); AP. 8.3(D). See 1 Bobbitt, *Indiana Appellate Practice and Procedure,* ch. 52 (1972).

---

1. We limit our conclusion to the facts of this case, where Seco praeciped the entire record.

Inasmuch as Stewart satisfied the above rules, we conclude that the cross-appeal is properly before this court.

ISSUE FIVE:

Stewart's contention in his cross-appeal is that the trial court erred in finding that Stewart had a duty to mitigate damages. He asserts that the trial court therefore should have considered his damages to be the amount stipulated in the liquidated damages provision of the contract (Clause No. 8) instead of reducing that amount by what he earned—or could have earned—during the remainder of the contract term.

The parties cite Indiana cases establishing when our courts must enforce a liquidated damages clause and when a discharged employee must mitigate damages. But none of the authority cited discusses the relationship between the two contract law principles—i.e., whether an employee discharged in breach of an employment contract containing a liquidated damages provision has a duty to mitigate damages. Indeed, there is a dearth of such cases.

However the New York Supreme Court, Appellate Division, recently faced this issue in *Musman* v. *Modern Deb, Inc.* (1975), 50 A.D.2d 761, 377 N.Y.S.2d 17, 19:

"Plaintiff's lost salary was computed at $108,330.50 for the period commencing with his termination through December 31, 1973, the original termination date of the employment agreement. However, the trial justice deducted wages earned by plaintiff during the aforesaid period from other employment. Paragraph 8(b)(i) of the agreement—in essence *a liquidated damages clause—fixes the exposure of the employer following a discharge without cause and thus serves to remove this case from the ordinary rule requiring the employee to mitigate damages.* . . . Mitigation of damages not being a factor, the record sustains calculation of the full compensation that plaintiff would have earned through the end of the original term at $108,330.50." (Our emphasis; citation omitted.)

See *Hecht* v. *Brandus* (1893), 2 Misc. 471, 21 N.Y.S. 1034, *affd.*, 4 Misc. 58, 23 N.Y.S. 1004.

Conversely, an employer was entitled to recover liquidated damages set in a contract breached by an employee although the employer hired a replacement at a lower salary. *Bottineau Public School District No. 1* v. *Zimmer* (N.D. 1975), 231 N.W.3d 178.

An examination of the general duty to mitigate damages reveals the rule does not apply in this case.

> "It is not infrequently said that it is the 'duty' of the injured party to mitigate his damages so far as that can be done by reasonable effort on his part. Since there is no judicial penalty, however, for his failure to make this effort, it is not desirable to say that he is under a 'duty.' His recovery against the defendant will be exactly the same whether he makes the effort and mitigates his loss, or not; but if he fails to make the reasonable effort, with the result that his injury is greater than it would otherwise have been, he cannot recover judgment for the amount of this avoidable and unnecessary increase." 5 Corbin, *supra*, § 1039, at 242.

Inasmuch as Seco's damages were fixed in the contract it made, those damages could not be *increased* by anything Stewart did or did not do. Therefore, we find no purpose in the trial court's imposition upon Stewart of a duty to mitigate damages.

In any event, the trial court's finding on this issue is not compatible with the prior law in Indiana. An employee discharged in breach of an employment contract is entitled to recover his salary for the balance of the term of the contract less what he, by reasonable efforts, might have earned during that time. *H. C. Bay Co.* v. *Kroner* (1925), 83 Ind. App. 541, 149 N.E. 184. The burden of pleading and proving this reduction falls on the employer. *Hamilton* v. *Love, supra.* However, an employee is not bound to accept employment of a substantially different character or grade. *Hinchcliffe* v. *Koontz* (1890) 121 Ind. 422, 23 N.E. 271. And it is the general rule that an employee is not obligated to accept even similar employment in a different

locality. See Annot., 44 A.L.R. 3d 629, §§ 7, 31(b) (1972), and *Restatement (2d), Agency,* § 455, Comment d.

Seco's evidence was that Stewart's first two jobs following his discharge were with employers engaged in activities different from Stewart's work experience and his third job was with an employer in a different locality.

For the above reasons we conclude that the trial court's computation of Stewart's damages should have been governed by the liquidated sum agreed upon by the parties and should not have included a consideration of what Stewart earned—or could have earned—between September 15, 1972, and July 16, 1973.

The trial court erred in its finding that Stewart had a duty to mitigate damages.

Accordingly, we reverse this cause as to that part of the decree mitigating the damages and affirm as to the rest and remand to the trial court to amend its findings and judgment accordingly.

Robertson, C.J. and Lybrook, J., concur.

NOTE.—Reported at 349 N.E.2d 733.